# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

FILED
04 NOV -1 AM 8:40
U.S. D...
N.D. OF ...

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ] |
| v. | ] |
| **SAIYUNG LAM,** | ] CR-04-BE-207-M |
| **Defendant.** | ] |

ENTERED
NOV - 1 2004

## MEMORANDUM OPINION

This case comes before the court on Defendant Saiyung Lam's objection (Doc. 18) to the magistrate's Report and Recommendation (Doc. 17) as to Mr. Lam's motion to suppress (Doc. 9).

The government charges Mr. Lam with possession of counterfeit or unauthorized credit cards in violation of 18 U.S.C. § 1029 (a)(3). Police officers found the credit cards in a duffel bag in Mr. Lam's rented Dodge Caravan after pulling Mr. Lam over for traffic violations. Mr. Lam objects to the magistrate's Report and Recommendation and requests "an Order suppressing his statement and all evidence seized by law enforcement officers based on the initial warrantless entry and search of his vehicle." *Motion to Suppress*, Doc. 9. The court has conducted its own evaluation of the propriety of the search in this case and disagrees with the magistrate's conclusion that the search was lawful. Therefore, the court sustains Mr. Lam's objections to the Report and Recommendation and grants the motion to suppress.

On May 6, 2004, Hoover Police Officer Christopher Hunter and the Riverside Police

1



Chief Norman were monitoring traffic together when they saw a white van following a car too closely while traveling in the passing lane of the interstate. *Hearing Transcript*, p. 9-10.[1] Officer Hunter testified that, when he "pulled out on" the van, "the white van made an evasive lane change into the non-passing lane. Upon [the police] getting closer, the [van] then straddled the two lanes, the center l[i]ne, driving down the middle of the interstate. Jerked the vehicle back." *Hearing Transcript*, p. 10; *see also id.* at 16-17. Officer Hunter noticed that Mr. Lam was "hiding behind the door post" and that, "upon getting close to him, he, a young male, didn't really fit the vehicle." *Hearing Transcript*, p. 17. The Dodge Caravan had a Florida tag. *Hearing Transcript*, p. 17.

The officers stopped the Dodge Caravan and Officer Hunter approached, noticing the rear seat of the van was missing, a single key was in the ignition, a duffel bag was on the second row seat, and fast food wrappers and unused paper grocery bags were behind the driver's seat. *Hearing Transcript*, p. 10, 26, 51. At some point, Officer Hunter also noticed packaging tape in the car. *Hearing Transcript*, p. 24. When Officer Hunter came to the van, Mr. Lam's cell phone was ringing, but he did not answer it. *Hearing Transcript*, p. 23. Officer Hunter explained the reason for the stop, and Mr. Lam volunteered that "he was tired, that he was coming from New York, going to Atlanta to see his cousin, and that he was going on to Mississippi." *Hearing Transcript*, p. 10. Mr. Lam said that he did not know exactly how long he would be in Mississippi, and that he was going there to investigate buying a restaurant and then he would go back to New York. *Hearing Transcript*, p. 12, 13, 15, 19. Officer Hunter asked for Mr. Lam's

---

[1] "*Hearing Transcript*"refers to the transcript of the evidentiary hearing conducted by the magistrate judge on July 28, 2004.

license and registration; Officer Hunter testified that Mr. Lam became "extremely nervous" while looking for the rental agreement. *Hearing Transcript*, p. 10.

Officer Hunter stated that, while Chief Norman wrote the warning ticket, Mr. Lam became "evasive" in answering questions about his Mississippi travel plans. *Hearing Transcript*, p. 16. The court notes that the record reflects an interpreter has been assigned to this case, *see* Doc. 3, but that Mr. Lam did not need the interpreter during the initial hearing, *Hearing Transcript*, p. 1, in which he did not testify.

After Chief Norman finished writing the warning ticket, Officer Hunter brought the ticket from the patrol car to Mr. Lam's van, *Hearing Transcript*, p. 11, and Mr. Lam signed the ticket, *Hearing Transcript*, p. 52. Then the officers "held the citation. [They] never gave the citation back to him," *Hearing Transcript*, p. 52, because at that time Officer Hunter thought he "had enough indicators that [Mr. Lam] was not free to go." *Hearing Transcript*, p. 40. At this point, after Officer Hunter "brought the warning back up" to Mr. Lam but Mr. Lam was not free to go, *Hearing Transcript*, p. 11, 40, 52, Officer Hunter asked Mr. Lam for permission to search the van. Mr. Lam refused to consent to the search, and Officer Hunter called Officer Woods to bring his drug dog to "do a free air sniff around the vehicle." *Hearing Transcript*, p. 11. Officer Woods arrived about ten minutes after he received the call to come with his dog. *Hearing Transcript*, p. 67. The dog alerted to the driver's side rear panel of the van and to the cargo hatch area. *Hearing Transcript*, p. 11. Without the dog, the officers then searched the interior of the van and the duffel bag. *Hearing Transcript*, p. 70, 79. They found unauthorized credit cards and a fake New York driver's license in cigarette boxes in the duffel bag. *Hearing Transcript*, p. 70. The officers did not find any drugs in the van. Afterward, upon questioning, Mr. Lam made

several incriminating statements. *Hearing Transcript,* p. 75.

Officer Hunter is a Hoover patrolman who also works as a reserve training officer for the Riverside Police Department. *Hearing Transcript,* p. 4, 6-7. Officer Hunter testified that he had "several hundred hours of classroom training" in interdiction (looking for a secondary crime) and "several thousand hours of hands-on training actually working the interstates and making cases." *Hearing Transcript,* p. 4-5. He is certified as a law enforcement instructor by the National Highway Safety Administration and he has SWAT and canine unit certifications. *Hearing Transcript,* p. 5.

At the conclusion of the hearing, the magistrate asked Officer Hunter to name the factors that indicated Mr. Lam was engaged in criminal activity beyond the initial traffic violations. *Hearing Transcript,* p. 86. In response, Officer Hunter named these: the presence of tape and brown paper bags, and the fact that the back seat was missing. *Hearing Transcript,* p. 86-88. Elsewhere in his testimony, Officer Hunter also spoke of other facts he says led him to suspect secondary criminal activity: as he rode by, Mr. Lam leaned back so that his face was obscured by the doorpost, *Hearing Transcript,* p. 38; a single key was in the ignition, *Hearing Transcript,* p. 6, 11; fast food wrappers were in the floor of the van, *Hearing Transcript,* p. 6, 11, 22-23, 24, 32-33; Mr. Lam was nervous, *Hearing Transcript,* p. 11, 16, 51; Mr. Lam lacked what Officer Hunter estimated was sufficient luggage for a trip from New York to Mississippi, *Hearing Transcript,* p. 6, 22, 33; Officer Hunter did not think Mr. Lam had enough time to drive from New York and stop in Atlanta before coming to Alabama, *Hearing Transcript,* p. 13, 29; Mr. Lam did not "fit" the car he was driving, *Hearing Transcript,* p. 6, 17, 35-37; and Mr. Lam did not answer his ringing cell phone, *Hearing Transcript,* p. 40-42, 55. As mentioned above,

4

Officer Hunter also testified that Mr. Lam was "evasive" in answering questions about his destination and how long he planned to stay in Mississippi. *Hearing Transcript*, p. 16.

Traffic stops are seizures implicated by the protections of Fourth and Fourteenth Amendments, but they are a limited form of seizure evaluated under the standard for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). *Terry* requires that an investigative stop must be justified in its inception by reasonable suspicion of criminal activity and that the investigation must be reasonably related in scope to the purpose of the stop. 392 U.S. at 19-20. To be reasonably related in scope to the purpose of the stop, "[t]he traffic stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted).

The parties do not dispute that the traffic stop was justified in its inception by the fact that Mr. Lam was following too closely and improperly changing lanes, nor does the defendant dispute that the officer had probable cause to search the van *after* the dog signaled the alert. The question before the court on this motion to suppress is whether, based on the totality of the circumstances, Officer Hunter had the requisite level of suspicion–reasonable suspicion–to justify detaining Mr. Lam beyond the time and scope necessary to complete the traffic stop so that he could bring the drug-detecting dog to do a free air sniff around the van. If not, the court must suppress the evidence confiscated in the search and Mr. Lam's incriminating statements that followed.

Officer Hunter's testimony establishes that he detained Mr. Lam beyond the time and scope necessary to process the traffic violations. After Mr. Lam signed the warning ticket, the

traffic stop was over, but the officers "held the citation" and did not allow Mr. Lam to leave because at that time Officer Hunter thought he "had enough indicators that [Mr. Lam] was not free to go." *Hearing Transcript*, p. 11, 40, 52. Instead, Officer Hunter called Officer Woods to bring his drug dog, and ten minutes later Officer Woods arrived. *Hearing Transcript*, p. 11, 67. Only *after* the dog alerted,[2] well after the traffic stop was over, the officers searched the van and found the credit cards and the fake license inside the duffel bag. *Hearing Transcript*, p. 11, 56, 70, 79. Mr. Lam made his incriminating statements *after* the stop was over and *after* the officers discovered the credit cards and fake license. *Hearing Transcript*, p. 75.

As noted above, when–as here–a traffic stop lasts longer than necessary to process the traffic violation, the additional detention must be justified by reasonable suspicion of criminal activity. *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). The court must decide whether, taken together and in light of Officer Hunter's experience, the factors relied upon by Officer Hunter were sufficient to form a basis for the "common sense conclusion" that he ought reasonably to suspect Mr. Lam of involvement in secondary criminal activity, or whether these factors were merely a "combination of factors that could plausibly describe the behavior of a large portion" of innocent travelers and that gave rise merely to a "hunch" or "inchoate suspicion" of secondary criminal activity–however good that hunch may have been. *See United States v. Tapia*, 912 F.2d 1367, 1371 (11th Cir. 1990); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980). As the Eleventh Circuit noted in *Tapia*, in answering that question, "the relevant

---

[2]Some questions remain as to the dog's history of false alerts and as to the propriety of rewarding the drug-detecting dog for alerting when the officers found no drugs. *Hearing Transcript*, p. 46, 81-82; *Defendant's Motion to Suppress Statements and Evidence*, Doc. 9, at 3-4.

6

inquiry ...is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." 912 F.2d at 1370-71. Though the court first comments on the amount of suspicion attached to each individual "noncriminal act" Officer Hunter said led him to suspect secondary criminal activity, the court is mindful that factors that are each alone insufficient to form the basis for reasonable suspicion may nevertheless be sufficient to form the basis for reasonable suspicion when viewed in their totality. *See United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990).

The presence of tape and paper bags and the absence of the back seat indicated to Officer Hunter that Mr. Lam intended to haul something, perhaps something wrapped in paper bags taped shut. Officer Hunter testified that "they[3] use the packing tape to pack U.S. currency, dope, stolen property. Basically that's what they use the tape for." *Hearing Transcript*, p. 25. Officer Hunter referred to the brown paper bags as "the packaging material that is commonly used to package narcotics." *Hearing Transcript*, p. 86. He stated that the "connection between the bags and the back seat" was that "[i]t's a possibility that they could put a large quantity of illegal narcotics in the back, the cargo area" after packaging the narcotics in the bags with the tape. *Hearing Transcript*, p. 87. Even an experienced officer should recognize, though, that brown paper bags are often used to pack legitimate items as well, and packaging is the general purpose of both paper bags and packaging tape.

Officer Hunter also testified that, as he pulled alongside the van, Mr. Lam "had both hands on the wheel and was pushing himself back by the doorpost." *Hearing Transcript*, p. 38.

---

[3] Officer Hunter testified frequently about what "they" do, but never identified who "they" are.

7

When asked whether "that [was] an indicator that he was committing some initial crime, some traffic violation, or . . .was an indicator that he had some secondary crime," Officer Hunter stated "No. That was just an indicator." *Hearing Transcript*, p. 38. In light of the fact that Mr. Lam's leaning back was "just an indicator," not an indicator of secondary criminal activity as opposed to an indicator of knowing violation of traffic laws or of stretching on a long drive, the court cannot give much consideration to this "indicator." The question before the court is not whether Officer Hunter was reasonable in suspecting Mr. Lam was violating the law,[4] but whether Officer Hunter was reasonable in suspecting secondary criminal activity beyond the initial traffic offense, and, therefore, justified in detaining Mr. Lam beyond the scope of the traffic stop.

Officer Hunter testified that another indicator of secondary criminal activity was a single key in the ignition. *Hearing Transcript*, p. 6, 11. When asked "what, if anything, entered [his] mind" in relation to the single key, Officer Hunter stated, "usually a rental vehicle has a second set of keys that's really on the key ring. Just had a single set. The other set was in the trunk area next to the jack." *Hearing Transcript*, p. 17; *see also id.* at 35. Even if two is the "usual" number of keys provided with a rental vehicle, the question is not whether the number of keys is unusual but whether the number of keys contributes to suspicion of illegal activity. Officer Hunter never said why, in his expertise as a police officer or otherwise, a single key in the ignition of a rental vehicle indicates secondary criminal activity. He testified that he had no reason, not even the number of keys in the ignition, to suspect that the rental agreement was "bogus." *See Hearing Transcript*, p. 29. Furthermore, because one major function of a having a

---

[4] The parties do not dispute that, at the time he pushed himself behind the doorpost, Mr. Lam was following the car in front of him too closely and changing lanes improperly.

8

second set of keys is to provide a spare in case the primary keys are lost or locked in the car, the court can see no reason why criminals would be more likely than noncriminals to remove the spare set from the ring when, as here, the driver does have two sets of keys.

Officer Hunter also cited as an indicator of secondary criminal activity the fact that fast food wrappers were on the floor of the van. *Hearing Transcript*, p. 6, 11, 23. In Officer Hunter's experience, fast food wrappers indicate that "people don't want to stop. They want to stay with the vehicle that has the illegal narcotics or the U. S. currency or stolen property, or even if they have a warrant on them, any second crime, they don't want to stop and leave that vehicle. They want to stay on the road and keep moving to get to their final destination." *Hearing Transcript*, p. 23. Though the court views Officer Hunter's impression of the fast food wrappers in light of his experience, even officers with Officer Hunter's training and experience must recognize that many noncriminals also do not want to stop when traveling and many noncriminals also have fast food wrappers in the floors of their cars. People frequently eat in their cars while traveling, especially people making long distance trips.

Another indicator to Officer Hunter was the lack of what he considered sufficient luggage for the trip Mr. Lam was taking. *Hearing Transcript*, p. 6, 22, 33. Because Officer Hunter did not know exactly how many changes of clothes were in the duffel bag until after he looked inside, the court will consider only that Officer Hunter saw a single duffel bag in the van before deciding to detain Mr. Lam beyond the scope of detention necessary for the traffic stop. *See Hearing Transcript*, p. 22, 26. The court must view the presence of the single duffel bag in light of Officer Hunter's experience, but Officer Hunter never testified why having "a lack of luggage or too much luggage," *Hearing Transcript*, p. 6, indicates secondary criminal activity.

9

He testified only that Mr. Lam's "lack of luggage would presume [sic] that [Mr. Lam] was making a quick turnaround." *Hearing Transcript*, p. 22.

Officer Hunter testified that Mr. Lam was "extremely nervous" and "just more nervous than normal." *Hearing Transcript*, p. 10, 51. The court accords due consideration to this factor in light of Officer Hunter's experience and considers this factor within the totality of the circumstances. Nervousness can indicate primary or secondary criminal activity. However, the Eleventh Circuit has recognized that "the Supreme Court has noted that a traffic stop is an 'unsettling show of authority' that may 'create substantial anxiety.'" *United States v. Perkins*, 348 F.3d 965, 970 (2003) (citation omitted) (holding that extreme nervousness combined with repeating an officer's questions, possessing a Florida license while claiming to live in Alabama, and making inconsistent statements about travel plans were not sufficient to give rise to reasonable suspicion).

Officer Hunter believed Mr. Lam was lying to him about his travel plans because he did not think Mr. Lam had time to have stopped over in Atlanta. *Hearing Transcript*, p. 12-13; 29-32. However, by Officer Hunter's own reckoning, Mr. Lam could easily have stopped over in Atlanta on his trip from New York. Officer Hunter, who once lived in New York, thought the trip from New York to the point of the traffic stop should have taken eighteen to twenty hours. *Hearing Transcript*, p. 30, 32. He stopped Mr. Lam between 11:30 a.m. and 12:00 noon CDT, slightly more than twenty-six hours after Mr. Lam rented the Dodge Caravan. *See Hearing Transcript*, p. 32. Therefore, even by Officer Hunter's calculation, Mr. Lam could easily have stopped in Atlanta to rest for six to eight hours.

Officer Hunter also considered as an indicator of secondary criminal activity the fact that

10

Mr. Lam did not "fit" the Dodge Caravan. *Hearing Transcript*, p. 6, 17. 35-37. Officer Hunter considered it odd that "a young man" would drive a "family-type vehicle, especially a rental vehicle." *Hearing Transcript*, p. 17. Mr. Lam did not "fit the vehicle" "because of the way he was dressed," "because he wasn't a very confident person," because of "just the way he looked...how he was holding himself, his demeanor," and because "you see very few young males driving a family-type vehicle. They are usually in a sports car or maybe a pickup truck." *Hearing Transcript*, p. 35-37. At the same time, Officer Hunter testified that a person does not have to be confident to "fit" a Dodge Caravan. *Hearing Transcript*, p. 36. According to Officer Hunter, the fact that Mr. Lam was not driving a sports car or a pickup truck–cars that would seem to require more confidence than Officer Hunter ascribed to Mr. Lam–indicated that Mr. Lam was involved in a second crime. *Hearing Transcript*, p. 37.

Officer Hunter never explained why the fact that Mr. Lam did not "fit" the van was an indicator of secondary criminal activity. Mr. Lam made clear that the van was rented and not his own. Moreover, even if young people rarely drive family-type vehicles, which this court doubts,[5] simply because something is unusual does not mean it is an indicator of secondary criminal activity.

According to Officer Hunter, another indicator of secondary criminal activity was the fact that Mr. Lam did not answer his cell phone when it was ringing. Officer Hunter did not say why, in his experience, not answering the cell phone indicated criminal activity. According to Officer Hunter, most people, while stopped by the police, do answer their ringing cell phones. *Hearing*

---

[5]The court notes that many young people cannot afford to drive a car that, by Officer Hunter's standards, "fits" them.

11

*Transcript*, p. 42, 54. For Mr. Lam to have answered his cell phone while he was stopped by the police would have been no more appropriate than for his lawyer to answer his cell phone when it rang in the hearing before this court. However, the question is neither propriety of answering the cell phone nor whether it is customary to answer one's phone during a traffic stop, but whether not answering the cell phone indicated criminal activity. Officer Hunter never explained any connection.

Finally, although he never cited evasiveness as an indicator of secondary criminal activity, at one point Officer Hunter testified that Mr. Lam was "evasive" in answering questions about how long he was going to stay in Mississippi and the reason for the stop. *Hearing Transcript*, p. 16. Though the court views what Officer Hunter felt was evasiveness in light of Officer Hunter's experience, the court also views Mr. Lam's ability to answer questions in light of the fact that Mr. Lam's English is "somewhat broken" and an interpreter has been assigned to Mr. Lam for these proceedings. *Hearing Transcript*, p. 8-9. Furthermore, even though, upon questioning, Mr. Lam was unable to say exactly how many days he would stay in Mississippi, the rental agreement showed that Mr. Lam rented the van for only a week. *Hearing Transcript*, p. 33-34.

The court must decide whether, taken together and in light of Officer Hunter's experience, these factors should have led Officer Hunter to the common-sense conclusion that Mr. Lam was engaged in secondary criminal activity. Though each circumstance is different, the court finds two cases are closely analogous to Mr. Lam's situation: *United States v. Perkins*, 348 F.3d 965 (11th Cir. 2003) and *United States v. Tapia*, 912 F.2d 1367 (11th Cir. 1990).

In *Perkins*, after giving Jesse Jerome Perkins a warning ticket for a lane violation, the

officer decided to continue to detain Perkins based on Perkins's extreme "nervousness, what the officer perceived as Perkins'[s] evasive behavior in response to his questions, and his hunch that Perkins was being untruthful about his destination." 348 F.3d at 968. When Perkins refused the officer's request to search the car, the officer called for a canine unit to search for drugs. After the canine unit arrived, Perkins admitted drugs were in the car and told the officers where to find them. 348 F.3d at 968-69. Noting that "a traffic stop is an 'unsettling show of authority' that 'may create substantial anxiety'," 348 F.3d at 970 (quoting *Delaware v. Prousse*, 440 U.S. 648, 657 (1979)), the Eleventh Circuit held that the totality of the indicators listed by the officer were insufficient to give rise to an articulable reasonable suspicion of other criminal activity beyond the initial traffic offense. *Id.*

In *United States v. Tapia*, a case perhaps even more closely analogous to Mr. Lam's,[6] the Eleventh Circuit held that "[b]eing Mexican, having few pieces of luggage [one nylon overnight bag], being visibly nervous or shaken during a confrontation with a state trooper, . . . traveling on the interstate with Texas license plates (not yet a crime in Alabama)," the driver looking away quickly as he passed the officer on the highway, the fact that the car was insured by a third party, and the fact that the trunk was not heavily loaded did "not provide a minimal, particularized basis for a conclusion of reasonable suspicion on the part of [the] [o]fficer." 912 F.2d 1367, 1370-71 (11th Cir. 1990). Instead, the totality of the circumstances in *Tapia* "could reasonably describe a large portion of the motorists engaged in travel on the interstate highways" and, therefore, should

---

[6]Like defendant in *Tapia*, Mr. Lam changed lanes when the patrol car followed him, possibly avoided eye contact with the policeman as the policeman pulled alongside, was nervous when stopped, traveled with empty cargo space, came from out of state, drove an out-of-state car that belonged to another, and carried less luggage than the officer thought was reasonable for the trip he said he was taking. *See Hearing Transcript*, p. 8-9.

13

not be "sanction[ed] as reasonably suspicious." *Id.* at 1371.

Taken together in their totality and viewed with deference to Officer Hunter's experience, the factors recited by Officer Hunter indicated that Mr. Lam was making a round trip from New York to Mississippi via Atlanta in the space of a week; that he packed a single duffel bag for the trip; that he was nervous about being pulled over for a traffic violation; and that he may have expected to haul something back with him, something packed perhaps in paper sacks and placed in the open cargo area left by the vacant seat. Some criminals may make such a trip in such a space of time for the purpose of hauling something back to New York with them in bags in the plain view cargo area of a rented family-type vehicle. However, the scenario–viewed from the perspective of the totality of all the facts and in light of the officer's experience–could just as easily describe a large number of innocent travelers, including travelers going to Mississippi to locate a new business to purchase.

Under *Tapia*, in determining whether "factors not in themselves proof of illicit conduct and/or quite consistent with innocent travel...when taken together, give rise to reasonable suspicion of criminal or drug activity...the relevant inquiry ...is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Tapia*, 912 F.2d at 1370-71. While the court's analysis "does not deal with hard certainties, but with probabilities," the "probability" that the court is to consider is not the probability that any given traveler will precisely match the detailed description and exact behavior of the traveler stopped by the police officer, but the probability upon which "practical people formulate[] certain common sense conclusions" that the traveler in question *is engaged in criminal activity*. *United States v. Cortez*, 449 U.S. 411, 417-18 (1980); *see also Tapia*, 912 F.3d

at 1371. "The corollary to such a statement . . . is that in formulating such common-sense conclusions, neither police officers nor courts should sanction as 'reasonably suspicious' a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways." *Tapia*, 912 F.3d at 1371.

The government is asking this court to hold that a seasoned officer would be reasonable in suspecting criminal activity of every young man who is making a long-distance, week-long round trip from New York to Mississippi in anything other than a sports car or pickup truck while contemplating bringing something back to New York with him in paper bags, and who is nervous about being stopped by police for a traffic violation. This holding the court cannot make, for to so hold would be to "sanction as reasonably suspicious" the innocent activity of a large percentage of travelers.

The court does not lightly enter a ruling that will, in effect, result in the release of someone who has confessed to possessing a fake license and unauthorized credit cards that he planned to use for purchasing and reselling black market cigarettes. In holding that Officer Hunter's suspicion of secondary criminal activity was not reasonable suspicion based on the requisite totality of specific, articulable facts, the court is mindful that the police officer's task of deciding in only moments when a search is reasonable is often difficult. The court is confident that Officer Hunter made his determination in good faith, but "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their houses, papers, and effects,' only in the discretion of the police." *Terry v. Ohio*, 392 U.S. 1, 22 (1968) (citations omitted). While the court must give deference to Officer Hunter's experience, it must give no deference to what was merely a hunch.

15

A separate order will be entered contemporaneously with this memorandum opinion.

October 29, 2004

*/s/ Karon O. Bowdre*
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE